

1  Laura A. Schroeder, NSB #3595
Therese A. Ure Stix, NSB #10255
2  Caitlin R. Skulan, NSB #15327
3  *Schroeder Law Offices, P.C.*
10615 Double R Boulevard, Suite 100
4  Reno, Nevada 89521
Telephone Number:   775-786-8800
5  Telecopy Number:   877-600-4971
Emails:            counsel@water-law.com
6                   Laura A. Schroeder - schroeder@water-law.com
7                   Therese A. Ure Stix - therese@water-law.com
                    Caitlin R. Skulan - c.skulan@water-law.com
8  *Attorneys for Plaintiffs, Colvin & Son, LLC and Stone Cabin Ranch, LLC*

9                    **UNITED STATES DISTRICT COURT**

10                       **DISTRICT OF NEVADA**

11  COLVIN & SON, LLC, and STONE CABIN
    RANCH, LLC,                                    **Case No.**
12
13                      Plaintiffs,
                                                   **COMPLAINT FOR JUDICIAL**
         v.                                        **REVIEW OF AGENCY DECISION**
14                                                 **RELATING TO WILD HORSES**
15  DEB HAALAND IN HER OFFICIAL
    CAPACITY AS SECRETARY OF THE
16  UNITED STATES DEPARTMENT OF THE
    INTERIOR; TRACY STONE-MANNING IN
17  HER OFFICIAL CAPACITY AS DIRECTOR
    OF THE BUREAU OF LAND
18  MANAGEMENT; JON RABY IN HIS
    OFFICIAL CAPACITY AS THE NEVADA
19  STATE DIRECTOR OF THE BUREAU OF
    LAND MANAGEMENT; DOUG FURTADO
20  IN HIS OFFICIAL CAPACITY AS DISTRICT
    MANAGER FOR THE BATTLE MOUNTAIN
21  DISTRICT, NEVADA, BUREAU OF LAND
    MANAGEMENT; and PERRY B. WICKHAM
22  IN HIS OFFICIAL CAPACITY AS THE FIELD
    MANAGER FOR THE TONOPAH FIELD
23  OFFICE, BATTLE MOUNTAIN DISTRICT,
    NEVADA, BUREAU OF LAND
24  MANAGEMENT,

25                      Defendants.

26  / / /

**Page  1 - COMPLAINT**

1    Plaintiffs, *Colvin & Son, LLC*, and *Stone Cabin Ranch, LLC*, do hereby allege:

2    1.    **Preliminary Statement.** Within Defendants exercise of discretion under the *Wild

3    and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq., Defendants made two (2)

4    determinations. First, Defendants determined an overpopulation of wild horses existed upon the

5    public lands within the Stone Cabin Complex ("SCC" or "Complex"), inclusive of the Stone

6    Cabin (wild horse) Herd Management Area ("Stone Cabin HMA") and the Saulsbury (wild horse)

7    Herd Management Area ("Saulsbury HMA"), including some adjacent areas outside of such

8    HMAs within the Ralston, Hunts Canyon, and Monitor Allotments; all within the State of Nevada.

9    Second, given the first determination, Defendants determined that action was necessary to remove

10   the excess wild horses within the SCC per a wild horse management plan.

11   2.    Based upon its determinations, Defendants considered and assessed Alternatives in

12   the Stone Cabin Complex Wild Horse Gather Plan, Environmental Assessment, DOI-BLM-NV-

13   B020-2023-0005-EA, dated April 11, 2023 ("2023 FEA"),[1] AR-81:SC_6182-6387,[2] as to the

14   action necessary to remove the excess wild horses within the SCC. Specifically, Alternative A –

15   Proposed Action in the 2023 FEA involved three (3) distinct actions over the 10-year life of the

16   wild horse management plan; namely: (1) Initially, gather and remove excess wild horses to

17   achieve low AML within the proposed gather area either in a single first gather or with a follow-

18   up gather(s) if all excess animals are not captured and removed in a single initial gather; (2) Apply

19   population growth suppression methods, including administering vaccine initial doses and booster

20   doses to gathered and released horses over multiple gathers, to slow population growth and

21   maintain the wild horse population within Appropriate Management Levels ("AML"); and (3)

22

23   [1] *See also* Stone Cabin Complex Wild Horse Gather Plan, Preliminary Environmental
     Assessment, DOI-BLM-NV-B020-2023-0005-EA, dated October 25, 2022 ("2022 DEA"), AR-
24   49:SC_1642-1791.

25   [2] The "AR-Document__" and then page number, referenced herein are to the Defendants'
     Administrative Record filed before the U.S. Department of the Interior, Office of Hearings and
26   Appeals, Board of Land Appeals ("IBLA").

Conduct additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed AML during the 10-year plan life after low AML was achieved.

3.     Based upon its 2023 FEA, Defendants issued their Decision Record dated April 11, 2023, AR-79:SC_6174-6177 ("2023 DR"), their Finding of No Significant Impact dated April 11, 2023, AR-80:SC_6178-6181 ("2023 FONSI"), and their 2023 FEA, AR-81:SC_6182-6387. The 2023 DR: (1) selected and implemented Alternative A - Proposed Action Alternative in the 2023 FEA, AR-79:SC_6175, *see also* AR-81:SC_6193-99; and (2) did not explicitly include any *conditions to delay implementation* of the 2023 DR, *see also* AR-79:SC_6174-77, *see also* AR-80:SC_6178-81 (wherein the 2023 FONSI also did not explicitly include any *conditions*).The DR was placed in immediate effect, AR-79:SC_6175.

4.     Notwithstanding the Defendants' Determinations, the 2023 FEA, the 2023 FONSI, and the 2023 DR, Defendants did not and have not, even as of the filing of this Complaint, actually implemented the 2023 DR. The lack of implementation of the 2023 DR is a violation of the *Wild and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq., causing harm to the Plaintiffs, to the public lands within the SCC, to wildlife species and their habitats, and to the wild horses themselves.

5.     Given the foregoing paragraphs, including all of the other allegations in this Complaint, the Plaintiffs file this Complaint for judicial review of the 2023 DR to hold unlawful any conditions (except for <u>on-site</u> conditions) which allow Defendants to defer (and continue to defer) implementation of the 2023 DR, and to compel immediate implementation of the 2023 DR, as required by the *Wild and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq.

6.     **Jurisdiction.** Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (Federal question) because this civil action arises under the Constitution, laws, or treaties of the United States, including the *Wild and Free Roaming Horses & Burro Act*, 16 U.S.C. § 1331, et seq. An actual, justiciable controversy exists between the parties, and requested relief, inclusive of

1  preliminary and permanent injunctive relief, is therefore proper under 5 U.S.C. §§ 702, 704, 705,

2  706(2) (*Administrative Procedure Act*). The federal government has waived sovereign immunity

3  in this action pursuant to 5 U.S.C. § 702.

4        7.    **Venue.** The basis of venue is: (a) 28 U.S.C. § 1391(b)(2) (A civil action, where a

5  "substantial part" of the claim arose); (b) 28 U.S.C. § 1391(e)(1)(A) (A civil action involving an

6  officer or employee of the United States, where "a defendant in the action resides"); and (c)

7  Nevada Federal District Court LR IA 1-6 and LR IA 1-8.

8        8.    **Plaintiffs.** Plaintiff *Colvin & Son, LLC* ("Colvin LLC") "is a limited liability

9  company in Nevada and authorized to do business in Nevada. Colvin [LLC] was formed over

10  twenty-two (22) years ago on August 18, 2000, when its original member, Tom Colvin, Jr.

11  owned private land and water rights and held a BLM Grazing Permit in the Stone Cabin and

12  Wagon Johnnie Allotments …, and held a USFS Grazing Permit in the Little Fish Lake and

13  Wagon Johnnie Allotments, Austin-Tonopah Ranger District, Humboldt-Toiyabe National

14  Forest, Nevada. Tom Colvin, Jr., and now Colvin & Son, LLC, have continued to operate a

15  yearlong, cow-calf livestock operation within the same area. This operation is inclusive of

16  private land, water rights, livestock, a BLM Grazing Permit, a USFS Grazing Permit, machinery,

17  equipment, and incidental assets to sustain such operation. This livestock operation has been

18  dependent upon public land use and national forest system land use for a long time and has

19  consistently cooperated with the federal land management agencies to achieve applicable range

20  land health standards and land use / forest plan objectives." AR-46:SC_1437-38.

21        9.    "Colvin [LLC] owns private land within the administrative boundary of the BLM

22  Stone Cabin Allotment which has historically served as the base property for BLM and USFS

23  Grazing Permits, and which has also historically served as the base of operations for its livestock

24  operation. Colvin [LLC] also owns *other* private land within the administrative boundary of the

25  BLM Stone Cabin, BLM Wagon Johnnie Allotment, USFS Little Fish Lake Allotment, USFS

26  Wagon Johnnie Allotment, and USFS McKinney Allotment, including some associated water

rights upon the private land, public lands, and national forest system lands." AR-46:SC_1438.

10. "Colvin [LLC] holds a BLM Grazing Permit which authorizes it to graze livestock upon the public lands within the Stone Cabin and Wagon Johnnie Allotments. Colvin [LLC] also holds a USFS Grazing Permit which authorizes it to graze livestock upon the Little Fish Lake and Wagon Johnnie Allotments." *Id*.

11. Plaintiff *Stone Cabin Ranch, LLC* ("Stone Cabin LLC") is a limited liability company in Nevada and authorized to do business in Nevada. Stone Cabin LLC was formed on April 10, 2006, though the family that formed Stone Cabin LLC and the family that still owns and operates Stone Cabin LLC have generationally owned and operated a yearlong, cow-calf livestock operation since 1883. It remains one of the oldest, continuous family run cow-calf livestock operations in the State of Nevada, with the current owners and operators consisting of fourth and fifth generation family members. This operation is inclusive of private land, water rights, livestock, a BLM Grazing Permit, a USFS Grazing Permit, machinery, equipment, and incidental assets to sustain such operation. This livestock operation has been dependent upon public land use and national forest system land use since 1883, and this livestock operation has consistently cooperated with the federal land management agencies, including taking up to 56% suspension of animal unit months ("AUMS") on the allotments to achieve applicable range land health standards and land use/forest plan objectives. *See* AR-46:SC_1421; AR-75:SC_4940; AR-78:SC_6156.

12. Stone Cabin LLC holds a BLM Grazing Permit which authorizes it to graze livestock upon the public lands within Stone Cabin, Hunts Canyon, and Willow Creek Allotments. *See* AR-46:SC_1421. Stone Cabin LLC also holds a USFS Grazing Permit which authorizes grazing livestock upon the USFS Monitor Complex, USFS Stone Cabin, and USFS Saulsbury Allotments which border the BLM Stone Cabin, BLM Hunts, and BLM Willow Creek Allotments.

13. **Defendants.** Defendant, DEB HAALAND IN HER OFFICIAL CAPACITY AS

SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR ("Haaland"),
is believed to maintain an office at 1849 C Street, N.W., Washington DC 20240, and manages
the public lands and the wild horses upon the public lands in, among others, the State of Nevada,
including the associated funding appropriated to the U.S. Forest Service ("USFS") and
transferred to the "Department of the Interior, Bureau of Land Management, for removal,
preparation, and adoption of excess wild horses from National Forest System lands" as per
Public Law 117-328, 136 Stat.4806 (12-29-2022) (which covers the fiscal year ending
September 30, 2023),[3] and as per Public Law 118-15, __ Stat. __, H.R. 5860-3 (1-3-2023)
(which covers the fiscal year ending September 30, 2024).

14.     Defendant, TRACY STONE-MANNING IN HER OFFICIAL CAPACITY AS
DIRECTOR OF THE BUREAU OF LAND MANAGEMENT ("Stone-Manning"), is believed to
maintain an office at 1849 C Street N.W., Washington DC 20240, and manages the public lands
and the wild horses upon the public lands in, among others, the State of Nevada, including the
associated funding appropriated to the USFS and transferred to United States Department of the
Interior ("USDI")-BLM as related to removal of excess wild horses as noted in paragraph 13
herein. The "Bureau of Land Management" is herein referred to as "BLM."

15.     Defendant, JON RABY IN HIS OFFICIAL CAPACITY AS THE NEVADA
STATE DIRECTOR OF THE BUREAU OF LAND MANAGEMENT ("Raby"), is believed to
maintain an office at 1340 Financial Blvd., Reno, Nevada 89502, and manages the public lands
and the wild horses upon the public lands in the State of Nevada, including the associated
funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess
wild horses as noted in paragraph 13 herein.

---

[3] Beyond the funds appropriated to the USFS and transferred to the USDI-BLM, the
*Consolidated Appropriations Act, 2023*, Public Law 117-328 (December 29, 2022), appropriated
to the U.S. Department of the Interior the sum of approximately $148 million for the "wild horse
and burro program." Public Law 117-328, 136 Stat. 4760. This authorization also included
authority to the Department of Interior to "enter into multiyear cooperative agreements with
nonprofit organizations and other appropriate entities … for the long-term care and maintenance
of excess wild free roaming horses." Public Law 117-328, 136 Stat. 4786.

16.     Defendant, DOUG FURTADO IN HIS OFFICIAL CAPACITY AS DISTRICT MANAGER FOR THE BATTLE MOUNTAIN DISTRICT, NEVADA, BUREAU OF LAND MANAGEMENT ("Furtado"), is believed to maintain an office at 50 Bastian Road, Battle Mountain, Nevada 89820, and manages the public lands and wild horses upon the public lands in the Battle Mountain District, State of Nevada, including the associated funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess wild horses as noted in paragraph 13 herein.

17.     Defendant, PERRY B. WICKHAM IN HIS OFFICIAL CAPACITY AS THE FIELD MANAGER FOR THE TONOPAH FIELD OFFICE, BATTLE MOUNTAIN DISTRICT, NEVADA, BUREAU OF LAND MANAGEMENT ("Wickham"), is believed to maintain an office at 1553 South Main Street, Tonopah, Nevada 89049, and manages the public lands and the wild horses upon the public lands in the Tonopah Field Office, Battle Mountain District, State of Nevada, including the associated funding appropriated to the USFS and transferred to USDI-BLM as related to removal of excess wild horses as noted in paragraph 13 herein.

18.     **Statement of Facts.** Stone Cabin Complex: The Stone Cabin Complex ("SCC" or "Complex") is located approximately 30 miles east of Tonopah, Nye County, Nevada. AR-81:SC_6185.

19.     The SCC is a subpart of the Tonopah Field Office, Battle Mountain District, Nevada, Bureau of Land Management ("BLM"), as illustrated in Map 1 in the 2023 FEA. AR-81:SC_6185, 87; *see also* AR-81:SC_6267 (Map of Adjacent HMAs and Wild Horse Territories ("WHTs") relative to SCC); *Id*. at 6268 (Map of Sage Grouse Habitat within SCC); *Id*. at 6269 (Map of Water Sources within SCC); *Id*. at 6270 (Map of WSAs and LWCs within SCC).

20.     The SCC is inclusive of the Stone Cabin (wild horse) Herd Management Area ("Stone Cabin HMA") and the Saulsbury (wild horse) Herd Management Area ("Saulsbury HMA"), including some adjacent areas outside of such HMAs within the Ralston, Hunts Canyon,

and Monitor Allotments, as also illustrated in Map 1 in the 2023 FEA. AR-81:SC_6185. 87; *see also* AR-46:SC_1440 (Map of Ralston, Hunts Canyon, Stone Cabin, and Wilson Creek Allotments). This entire area includes a total of 886,181 acres, of which the Stone Cabin HMA includes 407,705 acres, the Saulsbury HMA includes 135,018 acres, and the remainder (non-HMAs) includes 343,457 acres. AR-81:SC_6185-86. *Compare* AR-81:SC_6188 (wherein Table 1 within the 2023 FEA provides different acreage figures for the Stone Cabin and Saulsbury HMAs).

21.     The Stone Cabin HMA is home to a herd of wild horses. The "Appropriate Management Level" ("AML") was determined by the Defendants to be a low of 218 and a high of 364 head of wild horses for this HMA. AR-81:SC_6188.

22.     The Saulsbury HMA is also home to a herd of wild horses. The AML was determined by the Defendants to be a low of 24 to a high of 40 head of wild horses for this HMA. *Id.*

23.     An adjacent non-HMA, containing 343,457 acres (39% of the SCC), is also the non-home of other wild horses. This non-HMA should have *no* wild horses, whose presence is also adversely affecting rangeland health, ranch economics, hunting opportunities, and wildlife populations and habitats therein.

24.     Notwithstanding such AML levels, the number of wild horses within Stone Cabin HMA and Saulsbury HMA have exceeded the prescribed AMLs over time. AR-81:SC_6188 (Table 1).[4] The 2023 FEA reports that as of the Fall 2022, the "Estimated population" of wild horses in the Stone Cabin HMA was 651 head, or 179% above (high) AML, and in the Saulsbury

---

[4] It should be noted that this exceedance existed even after an emergency wild horse gather within the Stone Cabin HMA between September 1, 2021, and October 26, 2021, wherein 321 head of wild horses were gathered and removed from such HMA. AR-38:SC_1307-11 (BLM's Decision Record for 2011 Emergency Gather); AR-39:SC_1314-18 (BLM's DNA for 2011 Emergency Gather); AR-40:SC_1319-20 (BLM's Press Release as to 2011 Emergency Gather); AR-41:SC_1321-26 (BLM's Gather Report as to 2011 Emergency Gather).

1  HMA was 280 head, or 700% above (high) AML. *Id*. This exceedance was consistent with the

2  wild horse population data collected by the Defendants between 2013 and 2022.[5]

3       25.     Defendants collected monitoring data between 2013 and 2022 to assess the

4  impacts upon the public lands and public land resources, including as related to wild horses,

5  within the Stone Cabin and Willow Creek Allotments (inclusive of the Stone Cabin HMA) and

6  within the Hunts Canyon and Ralston Allotments (inclusive of the Saulsbury HMA).[6] This data

7  demonstrated grave resource conditions and wild horse conditions, including other adverse

8  impacts, as summarized by the Defendants in the 2023 FEA. *See* AR-81:SC_6189.[7]

9    [5] *See* AR-9:SC_0768 (2013); AR-14:SC_0792, 0793 (2014); AR-17:SC_0830 (2016); AR-
10  20:SC_1007 (2017); AR-22:SC_1038 (2018); AR-24:SC_1065 (2019); AR-32:SC_1262, AR-
    37:SC_1305 (2021); AR-45:SC_1419 (2022).

11
    [6] *See* AR-13:SC_0788-790 (2013, 2014), AR-12:SC_0784-786 (2014); AR-15:SC_0794-826
12  (2015, 2016, 2017); AR-18:SC_0831-875 (2014, 2016); AR-19:SC_0876-1005 (2016, 2017,
    2018); AR-21:SC_1009-1037 (2017); AR-27:SC_1077-1096 (2020); AR-28:SC_1097-1137
13  (2020); AR-33:SC_1264-1269 (2021); AR-42:SC_1328-1342 (2022); AR-43:SC_1343-1417
14  (2022); *see also* AR-8:SC_0663-766 (BLM's Field Reports for 2012 and 2013); AR-
    35:SC_1287-1300 (BLM's Field Report for 2021, inclusive of graphic pictures of adverse wild
15  horse conditions); AR-78:SC_6167-73 (Memorandum dated 4-29-2021 by *Intermountain Range
    Consultants* as to "End of Season Utilization" within Stone Cabin, Hunts Canyon, Willow Creek
16  Allotments in 2017-2022).

17  [7] The 2023 FEA stated at AR-81:SC_6189 that: (1) "Stone Cabin Complex estimated populations
    far exceed the established AML range for the project area (Table 1)." (2) "Moderate and heavy
18  utilization is evident on key forage species within the complex …, which, if sustained over time,
    interferes with vegetative regrowth and results in long term changes to rangeland health due to
19  the loss of native vegetation." (3) "Monitoring and historical information indicate that future
    emergency removals will be necessary as a result of lack of water and/or forage if excess animals
20  are not timely removed to bring the population back to AML." (4) "Wild horses are residing
    outside of HMA boundaries on public lands that are not managed for wild horses (documented
21  during aerial inventories (2006-2017) and 2021 resource flights). Animals leaving the Complex
    boundary and remaining outside of HMAs is indicative of insufficient habitat within the
22  Complex for the current population of horses." (5) "The overpopulation of wild horses is
23  resulting in vehicle collisions with wild horses residing within and outside the HMA on Access
    Road 504 (Rocket Road) as vehicles travel to or from the Tonopah Test and Training Range,
24  causing a public safety issue and risk of injury or death for the excess wild horses." (6) "Water
    sources on public lands that are available to wild horses are very limited in both HMAs, and
25  riparian degradation is occurring due to the overpopulation of wild horses using these areas." (7)
26  "Monitoring confirms the AMLs of 364 (Stone Cabin HMA) and 40 (Saulsbury HMA) must not
    be exceeded to achieve progress towards the Standards for Rangeland Health in accordance with
    the Mojave-Southern Great Basin RAC." AR-81:SC_6189.

26. Based upon the prescribed AMLs, the excess wild horse numbers, the monitoring data, and other information, the Defendants determined an excess of wild horses existed in accordance with the *Wild Horse Free-Roaming Horse and Burro Act* of 1971, as amended ("WFRHBA").[8] Specifically, the Defendants "**determined that at least 689 excess wild horses above the low end of AML are currently present in the Stone Cabin Complex**," adding that "[c]ensus flights have confirmed that additional wild horses reside outside of HMA boundaries in the area identified as the Stone Cabin Complex gather area," and further adding that "[**t]hese excess wild horses need to be removed in order to achieve the established AML, restore a thriving natural ecological balance (TNEB) and prevent further degradation of rangeland resources**." AR-81:SC_6189 (emphasis added).

27. Plaintiffs' Preliminary Comments to BLM: On April 27, 2022, Plaintiffs, through another, commented to the Defendant, Field Manager of the Tonopah Field Office, regarding the monitoring of the public lands within, among others, the Stone Cabin, Hunts Canyon, and Wilson Creek Allotments. This monitoring occurred in coordination and cooperation with BLM, as well as the USFS, wherein such monitoring disclosed "wild horse numbers grossly in excess of AML levels, as prescribed by the 1997 Tonopah RMP-ROD," and that this "excess has adversely implicated utilization levels and in some places the underlying rangeland condition." AR-46:SC_1421.

28. As to grossly excess wild horse numbers, Defendants' own wild horse population data **as of March 1, 2022**, ratified the foregoing statement by the Plaintiffs in paragraph (27), noting that **2022 Estimated Wild Horse Population** for the Stone Cabin HMA was 650 head of wild horses or 237% above (high) AML, and for the Saulsbury HMA was 337 head of wild horses or 703% above (high) AML. AR-45:SC_1419.

---

[8] Defendants confirmed in the 2023 FEA that "16 USC 1333 (b)(2) directs the secretary to make an excess determination based on the basis of all information currently available, and does not include language that would allow for a delay of this immediate removal in order to collect any type of information." AR-81:SC_6209.

29.     In addition, Defendants' own wild horse population data **as of March 1, 2023**, ratified the foregoing statement by the Plaintiffs in paragraphs (27) and (28), noting that **2023 Estimated Wild Horse Population** for the Stone Cabin HMA was 435 head of wild horses or 120% above (high) AML,[9] and for the Saulsbury HMA was 388 head of wild horses or 970% above (high) AML.

30.     As to the adverse utilization levels, the utilization data in November 2021, ratified the foregoing statement by the Plaintiffs in paragraph (27).[10]

31.     Plaintiffs' preliminary comments added that based upon such monitoring: "[Plaintiffs] … demand that the BLM … forthwith return such allotments to the prescribed AML levels. … [Plaintiffs] … contend that, due to the year-round use by excess wild horses, the gather should not be anything less than full reduction to low AML (or lower), and due to on-the-ground

---

[9] It should be noted that, while there still existed an excess of (high) AML as of March 1, 2023, there was an observed decrease in the excess within the Stone Cabin HMA between 2022 (with 650 head of wild horses) and 2023 (with 435 head of wild horses). This decrease was likely due to the wild horses roaming beyond the boundary of the Stone Cabin HMA due to "insufficient habitat," as the Defendants stated was occurring in the 2023 FEA. *See also* AR-106:SC_6682-6690 (wherein a "Genetic Analysis for the Saulsbury HMA" confirmed the mixing of wild horses within the area, stating at SC_6685 that "Genetic variability of this herd is high and likely **due to mixing with nearby herds**." (emphasis added)); AR-81:SC_6189; AR-108:SC_6702-6724 (wherein a "Genetic Analysis for the North Stone Cabin" confirmed the mixing of wild horses within the area, stating at SC_6705 that "Genetic variability of this herd is quite high but there is a high percentage of variation that is at risk. The levels of allelic diversity are higher than seen in 2010 but the percentage of alleles at risk is slightly lower, although still high. These results could be **due to gene flow into this area from other HMAs**." (emphasis added)); AR-105:SC_6666-6681 (wherein a "Genetic Analysis for the South Stone Cabin" confirmed the mixing of wild horses within the area, stating at SC_6670 that "Genetic variability of this herd in general is on the high side but there is a high percentage of variation that is at risk. As well, heterozygosity levels and number of alleles have declined quite a [bit] since 2012. The levels of allelic diversity are lower also, although still high. **The difference could be due to sampling the entire area of the HMA in previous years compared to where the horses came from within the HMA this time**." (emphasis added")).

[10] AR-42:SC_1328-1342 (2022, relating to the Hunts Canyon Allotment); AR-43:SC_1343-1417 (2022, relating to the Stone Cabin Allotment); *see also* AR-78:SC_6167-73 (Memorandum dated 4-29-2021 by *Intermountain Range Consultants* as to "End of Season Utilization" within Stone Cabin, Hunts Canyon, Willow Creek Allotments in 2017-2022).

1    conditions, BLM … should consider removing wild horses to the low AML (or lower) on a

2    continuing annual basis for a number of years. AR-46:SC_1421.

3          32.    2022 DEA: On October 24, 2022, Defendants issued for public comment the Stone

4    Cabin Complex Wild Horse Gather Plan, Preliminary Environmental Assessment, DOI-BLM-NV-

5    B020-2023-0005-EA ("2022 DEA"). AR-49:SC_1642-1791. This 2022 DEA speaks for itself,

6    though for purposes of this Complaint, the "Purpose and Need" of the 2022 DEA was stated by

7    the Defendants to be as follows:

8          The purpose of the Proposed Action is to gather and remove excess wild horses
           from within and outside of the Stone Cabin Complex and to reduce the wild horse
9          population growth rates to achieve and maintain established AML.

10         The need for the action is to prevent undue or unnecessary degradation of the public
           lands associated with excess wild horses, and to restore a TNEB and multiple-use
11         relationship on public lands, consistent with the provisions of Section 1333(b) of
           the WFRHBA.
12

13   AR-49:SC_1649.

14         33.    The 2022 DEA considered and assessed three (3) alternatives, i.e., Alternative A -

15   Proposed Action Alternative, AR-49:SC_1652-58, Alternative B - Gather & Removal without

16   Fertility Control Treatments Alternative, *Id*. at 1658; and Alternative C - No Action Alternative,

17   *Id*. at 1663. The 2022 DEA also considered and assessed several "Management Actions

18   Common to Alternatives A, and B." *Id*. at 1658-63. The 2022 DEA also considered but

19   eliminated from further consideration several other Alternatives. *Id*. at 1663-68.

20         34.    Alternative A – Proposed Action Alternative stated in part in the 2022 DEA the

21   following:

22         The Proposed Action (Alternative A) would involve three distinct types of management
           activities over the 10-year life of the plan:
23
24         1. Initially, gather and remove excess wild horses to achieve low AML within the proposed
           gather area either in a single first gather or with a follow-up gather(s) if necessary because
25         all excess animals could not be captured and removed in a single gather. Based on BLM's
           experience over the past decades, there are a number of factors that can affect BLM's
26         ability to achieve AML with a single first gather, including: that gathers typically achieve

**Page 12 - COMPLAINT**

less than a 100% gather efficiency (i.e., all wild horses in the herd cannot be gathered or observed to determine how many remain in an HMA since wild horses evade capture or remain hidden from view during a helicopter gather); the likely population undercount can result in additional excess wild horses being identified in a follow-up inventory even when the targeted numbers of estimated excess wild horses have been removed; weather conditions that may impede achieving the targeted removal numbers during gather operations, and limited contractor availability among other factors. For this reason, if AML cannot be achieved through a single first gather, a follow-up gather(s) may be necessary to achieve low AML.

2. Over the 10-year period, apply population growth suppression (fertility control) measures, including administering booster doses, to gathered and released horses over multiple gathers, along with sex ratio adjustment, to slow population growth and maintain the wild horse population within AML to allow for resource recovery and reduce the number of excess animals that would have to be removed from the public range over time.

3. Over the 10-year period, manage for a population that remains within AML by conducting additional/maintenance gathers after the initial gather(s) to bring wild horse population back to low AML if the population grows to again exceed AML during the 10-year plan life after low AML was achieved, in order to provide a sufficient period of time for degraded range resources to recover. * At the current population size, if a single gather were to be immediately implemented to reach low AML, the BLM would need to gather and remove approximately 689 excess wild horses within the complex. However, the wild horse population grows each year and if an initial gather is delayed, or if multiple gathers are necessary to achieve low AML because all excess animals could not be captured and removed in a single gather, the number of excess wild horses needing gather and removal to achieve low AML would be higher. All three components of the Proposed Action would allow BLM to achieve management goals and objectives of attaining a herd size that will not exceed AML and that will result in a TNEB on the range as required under the WFRHBA.

It is expected that gather efficiencies and other factors discussed above, **as well as off-range corral space availability** may not allow for the attainment of low AML during a single initial gather (i.e., if not enough horses are successfully captured and removed to reach low AML). If low AML is not achieved with the first gather, the BLM Tonopah Field Office would return to the complex to remove remaining excess horses above low AML in one or, if necessary, more follow-up gathers. Multiple gathers will be used over a 10-year period to gather a sufficient number of wild horses as to implement (in a phased manner) the population control component of the Proposed Action, which includes sex ratio adjustment (so that the herd may be composed of as many as 60% males and as few as 40% females) and fertility control treatments (PZP vaccines, GonaCon-Equine, IUDs, or Gelding) for wild horses remaining in the complex. Because continued management of the Complex's wild horse population at AML over the 10-year period is necessary to allow degraded range resources to recover and to achieve a TNEB, BLM would maintain the population at AML through additional removals (during follow-up gathers) if the population should again exceed AML after low AML is reached. Prioritization of excess wild horse removals would be as follows: from areas where public health and safety issues have been identified, private land and non-HMA, areas where resource degradation/deficiency has been identified, and within the complex areas as needed to reach and maintain AML. Selective removal procedures would prioritize removal of

younger excess wild horses after achieving AML within the complex, and allow older, less adoptable, wild horses to be released back to the complex. BLM could begin implementing the population control components (PZP vaccines, GonaCon, IUDs, Gelding) of this alternative as part of the initial gather if gather efficiencies allow. To help improve the efficacy and duration of fertility control vaccines, mares could be held for an additional 30 days and given a booster shot prior to release.

Population inventories and routine resource/habitat monitoring would continue to be completed every two to three years to document current population levels, growth rates, and areas of continued resource concerns (horse concentrations, riparian impacts, over-utilization, etc.). Genetic diversity monitoring would take place as part of gather activities (BLM 2010). The BLM Tonopah Field Office does not have the discretion to decide when and how much funding out of the BLM's total national budget will be allocated toward the proposed action in any given year, and there are tens of thousands of excess wild horses that BLM has determined ought to be removed across dozens of HMAs. The timing and amount of funding from the national BLM budget for this action is outside the scope of this decision. Therefore, **funding limitations and competing national priorities may impact the timing and ability to gather and conduct population control components of the Proposed Action.**

AR-49:SC_1652-54 (emphasis added).

35.      As quoted in paragraph (34), and as relevant to this Complaint, Alternative A – Proposed Action Alternative in the 2022 DEA included two (2) *conditions to actual implementation*: (1) Defendants conditioned implementation upon "off-range corral space availability"; and (2) Defendants conditioned implementation upon "funding limitations and competing national priorities." AR-49:SC_1653-54.

36.      The 2022 DEA provided no rationale for such *conditions*, except perhaps the Defendants' statement that "[t]he timing and amount of funding from the national BLM budget for this action is outside the scope of this decision." AR-49:SC_1653. However, such statement is contradicted by the "Purpose and Need" in the 2022 DEA, AR-49:SC_1649, and by *other* statements in the 2022 DEA relative: (a) to the "No Action Alternative," AR-49:SC_1663;[11] (b)

---

[11] AR-49:SC_1663 states that "Although the **No Action Alternative does not comply with the WFRHBA of 1971 and does not meet the purpose and need for the action in this EA**, it is included as a basis for comparison with the Proposed Action.

Under the No Action Alternative, a gather to remove excess wild horses would not occur. There would be no active management to control the size of the wild horse population or to bring the wild horse population to AML. The current wild horse population would continue to increase at a rate of 14%-22.7% per year (Appendix III). Within three years, the wild horse population could exceed 1100 animals, or nearly three times AML. Increasing numbers of excess wild

to the "Gathering the Complex to the High end of AML," AR-49:SC_1667-68;[12] and (c) to the "Gathering the Complex after the Completion of a Rangeland Health Assessment," AR-49:SC_1670.[13]

37.     <u>Public Comments, including by the Plaintiffs, NDOW, and Eureka County, Nevada</u>: After the 2022 DEA was issued, Defendants released it for public comment. Defendants thereafter received comments to the 2022 DEA between November 6, 2022, and December 2, 2022. *See* AR-50:SC_1792 to AR-78:SC_6173. These comments speak for themselves but include comments from the Plaintiffs dated November 23, 2023, AR-75:SC_4940, and dated December 2, 2022, AR-78:SC_6156-6173, as well as from the State of Nevada, Department of Wildlife

/ / /

/ / /

/ / /

---

horses will result in the continued deterioration of rangeland resources within the complex, wild horse health will deteriorate, and public safety concerns will increase along heavily traveled roads. There would also be an increase in emergency actions necessary to address the overpopulations of wild horses and limited water/forage resources in the complex." Emphasis added.

[12] AR-49:SC_1667-68 states "**This alternative would not meet the Purpose and Need for this EA** which it is to remove excess wild horses from within and outside the Stone Cabin complex, to reduce the wild horse population growth rates to manage wild horses within established AML ranges, and to minimize the frequency of gathers needed to remove excess wild horses.

**The need for the action is to prevent undue or unnecessary degradation of the public lands associated with excess wild horses, to restore a TNEB and multiple use relationship on public lands, consistent with the provisions of Section 1333(b) of the 1971 WFRHBA**. For these reasons, this alternative was eliminated from further consideration." Emphasis added.

[13] AR-49:SC_1670 states that "the **Alternative would not meet the Purpose and Need for action** identified in Section 1.2: 'to achieve and maintain the AML through removal of excess wild horses from within and outside of the HMA boundaries, and to reduce the population growth rate to prevent undue or unnecessary degradation of the public lands, and protect rangeland resources from deterioration associated with excess wild horses within the HMAs, **and to restore a TNEB and multiple use relationship on the public lands consistent with the provisions of Section 1333 (a) of the 1971 WFRHBA**.'" Emphasis added.

1   ("NDOW") dated November 17, 2022, AR-52:SC_1795-1796,[14] and Eureka County Board of

2   Commissioners' ("Eureka County") dated November 18, 2022, AR-65:SC_4732-4736.[15]

3        38.    Plaintiffs' comments dated December 2, 2022, objected to the *conditions to actual*

4   *implementation* in the 2022 DEA, as noted above in paragraph (35). Specifically, the Plaintiffs

5   stated that:

6
7   > Alternatives A and B are not in conformance with either the Wild Free-Roaming
   > Horses and Burros Act of 1971, or the Tonopah Resource Management Plan.

8   > The WFRHBA does not condition the removal of excess horses depending on "off-
   > range corral space" or "funding limitations and competing national priorities", as
9   > the PEA appears to do at page 11. While the action of reducing excess wild horses
   > to within AML is in conformance with the Act, the unnecessary delay in BLM
10  > becoming compliant with the Act – perhaps only in the 10th year (if then) - is not
   > in conformance with the Act.

11  > Likewise, the Tonopah RMP does not condition the removal of excess wild horses
   > upon "off-range corral space" or "funding limitations and competing national
12  > priorities", as the PEA appears to do at page 11. While the action of reducing excess
   > wild horses to within AML is in conformance with the RMP, the unnecessary delay
13  > in BLM becoming compliant with the RMP – perhaps only in the 10th year (if then)
   > - is not in conformance with the RMP, or the sage-grouse Amendments to the RMP.

14

15  AR-78:SC_6159.

16  ---

    [14] *See* AR-52:SC_1795 (wherein NDOW stated that "We understand the Stone Cabin Complex
17  includes the Stone Cabin and Saulsbury Herd Management Areas and the proposed gather area
    represents the ~542,724 acres of these HMAs and ~343,457 acres outside of HMA boundaries in
18  the Ralston, Hunts Canyon, and Monitor grazing allotments. We also understand the estimated
    population size of wild horses for the HMAs far exceeds respective appropriate management
19  levels (AMLs) and **the wild horses leaving and remaining outside of the HMAs indicate
    insufficient range conditions within the Complex for sustaining a thriving ecological
20  balance with other multiple use values including the ability for BLM making progress
    towards meeting Standards for Rangeland Health in accordance with the Mojave-Southern
21  Great Basin RAC. Obviously, the situation has serious implications for wildlife and habitat
22  quality and availability.**" (emphasis added)).

23  [15] *See* AR-65:SC_1795 (wherein Eureka County stated that "**Relieving the severe
    overpopulation of wild horses is imperative to improving range conditions and attaining
24  multiple-use objectives**. In the absence of active herd management, vegetation communities
    have been badly damaged, herd health is poor, wildlife habitat has been substantially reduced,
25  livestock operations have suffered major economic losses, and hunting and recreational
    opportunities have been compromised. We cannot express strongly enough the importance of
26  reaching and maintaining wild horse herd populations at appropriate management levels (AML)
    over the long-term and keeping horses within the Complex." (emphasis added)).

39.     _2023 DR, 2023 FONSI, 2023 FEA_: Several months later, and even after collecting *further* population data as of March 1, 2023, on April 11, 2023, Defendants issued their 2023 DR, AR-79:SC_6174-6177, their 2023 FONSI, AR-80:SC_6178-6181, and their 2023 FEA, AR-81:SC_6182-6387. These documents speak for themselves, though for purposes of this Complaint, the 2023 DR: (1) selected and implemented Alternative A - Proposed Action Alternative in the 2023 FEA, AR-79:SC_6175, *see also* AR-81:SC_6193-99; and (2) did not explicitly include any of the *conditions to actual implementation* noted in paragraph (35), *see also* AR-79:SC_6174-77, *see also* AR-80:SC_6178-81 (wherein the 2023 FONSI also did not explicitly include any of such *conditions* noted in paragraph (35)).

40.     _2023 FEA_: As to the 2023 FEA, the 2023 FEA had the *same* "Purpose and Need" as the 2022 DEA, as quoted above in paragraph (32). *Compare* AR-49:SC_1649 and AR-81:SC_6189.

41.     In addition, as to the 2023 FEA, the 2023 FEA considered and assessed three (3) alternatives similar to those considered and assessed in the 2022 DEA. *See* a comparison between AR-81:SC_6193-99 and AR-49:SC_1652-58.

42.     Notwithstanding the Plaintiffs' comments objecting to the *conditions to actual implementation* noted in paragraph (35), Defendants carried-forward from the 2022 DEA into the 2023 FEA such *conditions*, i.e., "off-range corral space availability," AR-81:SC_6194, and "funding limitations and competing national priorities," *Id.*

43.     However, it should be noted that the 2023 FEA abandoned the claimed rationale for such *conditions*, removing from the 2023 FEA the previous purported rationale language in the 2022 DEA, as illustrated as follows:

/ / /

/ / /

/ / /

/ / /

| Language in the 2023 FEA | Language in the 2022 DEA |
|---|---|
| Population inventories and routine resource/habitat monitoring would continue to be completed every two to three years to document current population levels, growth rates, and areas of continued resource concerns (horse concentrations, riparian impacts, over-utilization, etc.). Periodic genetic diversity monitoring would take place as part of gather activities (BLM 2010). Funding limitations and competing national priorities may impact the timing and ability to gather and conduct the population control components of the Proposed Action. | Population inventories and routine resource/habitat monitoring would continue to be completed every two to three years to document current population levels, growth rates, and areas of continued resource concerns (horse concentrations, riparian impacts, over-utilization, etc.). Genetic diversity monitoring would take place as part of gather activities (BLM 2010). **The BLM Tonopah Field Office does not have the discretion to decide when and how much funding out of the BLM's total national budget will be allocated toward the proposed action in any given year, and there are tens of thousands of excess wild horses that BLM has determined ought to be removed across dozens of HMAs. The timing and amount of funding from the national BLM budget for this action is outside the scope of this decision**. Therefore, funding limitations and competing national priorities may impact the timing and ability to gather and conduct population control components of the Proposed Action. |
| AR-81:SC_6194 | AR-49:SC_1653-54 (emphasis added, as to the rationale language in the 2022 DEA, yet then removed in the 2023 FEA). |

Based thereon, there is no stated rationale for the *conditions to actual implementation* within the 2023 FEA, or within the 2023 DR and the 2023 FONSI. In fact, there is rationale in the 2023 FEA that is contrary to such *conditions*. The 2023 FEA, as to "Gathering the Complex after the Completion of a Rangeland Health Assessment," stated:

> This alternative would not be in conformance with 16 USC 1333 (b)(2), which, upon determination of excess, directs the secretary to immediately remove excess animals from the range so as to achieve appropriate management levels. 16 USC 1333 (b)(2) directs the secretary to make an excess determination based on the basis of all information currently available, and does not include language that would allow for a delay of this immediate removal in order to collect any type of information.

AR-81:SC_6209.

44.   <u>BLM's Land Use Plan</u>: Like the 2022 DEA, the 2023 FEA included a "Land Use Plan Conformance and Consistency with Other Authorities" statement. AR-81:SC_1649-52.

However, such a statement included no legal justification for the conditions noted in paragraph (42).

45.     Final Agency Action: The 2023 DR stated that the "decision is effective immediately pursuant to 43 CFR 4770.3(c)." AR-79:SC_6175.

46.     The 2022 DR also stated that it was administratively appealable to the U.S. Department of the Interior, Office of Hearings and Appeals, Board of Land Appeals ("IBLA"), and that it was also subject to being stayed (aka enjoined) pending any administrative appeal to the IBLA. AR-79:SC_6176-77.

47.     On May 11, 2023, Plaintiffs filed their administrative Notice of Appeal of the 2023 DR, the 2023 FONSI, and the 2023 FEA to the IBLA. The administrative appeal did not wholly challenge the 2023 DR, the 2023 FONSI, or the 2023 FEA. Instead, the administrative appeal challenged the deferral of the *actual* implementation of 2023 DR, inclusive of the conditions allowing such deferral of the *actual* implementation stated in paragraph (42).

48.     On June 22, 2023, Defendants filed with the IBLA and the Plaintiffs the Administrative Record.

49.     On August 25, 2023, Plaintiffs filed their Statement of Reasons in support of their administrative appeal with the IBLA, and the Plaintiffs also filed their Petition for Partial Stay to stay (aka enjoin) the effectiveness of the Defendants' reliance upon the conditions stated in paragraph (42) which deferred (and continue to defer) the *actual* implementation of the 2023 DR.

50.     On September 29, 2023, the IBLA denied the Petition for Partial Stay. Such denial continued to make the 2023 DR operable and effective, inclusive of the conditions stated in paragraph (42), which allowed the Defendants to continue to indefinitely defer the *actual* implementation of the 2023 DR.

51.     Thereafter, contemporaneous with filing this Complaint, Plaintiffs dismissed their administrative appeal before the IBLA because the agency action was final.

**Page  19 - COMPLAINT**

52.     The 2023 DR, 2023 FONSI, and 2023 FEA are final agency action per 5 U.S.C. § 704, given the 2023 DR stated on its face that it was "effective immediately pursuant to 43 CFR § 4770.3(c)", AR-79:SC_6175, and given the Plaintiffs, through agency rule, to make the 2023 DR, 2023 FONSI, and 2023 FEA inoperable pending their administrative appeal was denied by the IBLA via an Order dated September 29, 2023. *See* 43 C.F.R. § 4.21(c) (10-1-2022 Edition) (wherein "No decision which at the time of its rendition is subject to appeal to … an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective in the manner provided in paragraphs (a)(3) or (b)(4) of this section or a decision has been made effective pending appeal pursuant to paragraph (a)(1) of this section or pursuant to other pertinent regulation.")

**CLAIM FOR RELIEF**
**VIOLATION OF THE *WILD AND FREE-ROAMING HORSES AND BURRO ACT***

53.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 52.

54.     While the standard of review of an agency's interpretation of a statute is governed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("*Chevron*"), *Chevron* or what is commonly known as the "Chevron Standard" is currently subject to review the U.S. Supreme in *Loper Bright Enterprises, et al. v. Gina Raimonda, Secretary of Commerce, et al*., No. 22-451. *See* Docket for 22-451 (supremecourt.gov) (last checked on 10/11/2023 @ 9:01 A.M.). The Order dated May 1, 2023, stated that "Petition GRANTED limited to Question 2 presented by the petition." The underlying "Question 2" in the Petition for Writ of Certiorari stated: "2. Whether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency." *Loper Bright Enterprises, et al.*, No. 22-451, Petition for Writ of Certiorari dated November 10,

2022, at page ii.

55.     The pending Writ of Certiorari in *Loper Bright Enterprises, et al.*, No. 22-451, will likely be decided by the Supreme Court with potential Oral Arguments in winter 2023, and with potential Opinion in spring 2024. Any Opinion by the Supreme Court may impact the "Standard of Review – Interpretation of a Statute" subject to this Complaint; namely, *Wild and Free Roaming Horses & Burro Act*, 16 U.S.C. §§ 1331-1340 ("WFRHBA").

56.     In the meantime, and absent further direction by the U.S. Supreme Court in *Loper Bright Enterprises*, *Chevron* prescribes a two-part test to follow when faced with reviewing an agency's construction of a statute which it administers. *Chevron*, 467 U.S. at 842-43. Step one is "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. Step two is "if the statute is silent or ambiguous with respect to the specific issue," whether the agency's interpretation of the statute "is based on a permissible construction of the statute." *Id*.

57.     Congress has "directly spoken to the precise question at issue" subject to this Complaint.

58.     Congress enacted the WFRHBA to protect wild free-roaming horses and burros as an integral part of the natural areas where they were found. 16 U.S.C. § 1331; *see generally In Defense of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1061-62 (9th Cir. 2014).

59.     In 1978, Congress amended the WFRHBA to "facilitate the humane adoption or disposal of excess wild free-roaming horses and burros which, because they exceed the carrying capacity of the range, pose a threat to their own habitat, fish, wildlife, recreation, water and soil conservation, domestic livestock grazing, other rangeland values." 43 U.S.C. § 1901(a)(6). Under the 1978 amendments, Defendants are responsible for managing wild horses "at the minimal feasible level," and "in manner that is designed to achieve and maintain a natural balance" between wild horse and burro populations, wildlife, livestock, and vegetation, and to protect the range from "the deterioration associated with overpopulation" of wild horses and burros on the public lands. 16 U.S.C. §§ 1333(a), 1333(b)(2); *see also* 43 C.F.R. § 4710.4 (10-1-

1   2022 Edition); *Dahl v. Clark,* 600 F.Supp. 585, 593-94 (D. Nev. 1984); *Michael Blake,* 138

2   IBLA 170, 177 (1997).

3       60.    "Excess animals" is a term defined by statute as wild free-roaming horses or

4   burros which either have been removed or must be removed from an area "in order to preserve

5   and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16

6   U.S.C. § 1332(f).

7       61.    To comply with the foregoing statutory obligations, the statute's removal

8   provision envisioned a two-step decision-making process: First, Defendants are to determine

9   whether any overpopulation exists, and second, Defendants are to determine whether action is

10   necessary to remove excess animals. *DeLong Ranches, Inc.*, IBLA 2012-235 (IBLA Order dated

11   Sept. 16, 2014) at 13; *see also American Wild Horse Campaign*, 198 IBLA 1, 2 (2022); *State of*

12   *Wyoming v. United States Department of Interior*, 839 F.3d. 938, 944-945 (10th Cir. 2016). This

13   two-step process "may determine that action is *not* necessary to remove these horses exceeding

14   the AML and, alternatively, it may determine that such action is necessary and prescribe a

15   management plan implementing a combination of actions and methods." *DeLong Ranches, Inc.*

16   at 13-14 (emphasis added).

17       62.    Here, in the exercise of their discretion, Defendants conformed to the two-step

18   decision-making process.

19       63.    As to step one, Defendants made their requisite determination that an

20   overpopulation existed. This is/was demonstrated by the "Rationale" in the 2023 DR, AR-

21   79:SC_6175-76, and by language in the 2023 FEA, stating:

22           Based upon all current information available at this time, the BLM has determined
        that at least 689 excess wild horses above the low end of AML are currently present

23           in the Stone Cabin Complex. Census flights have confirmed that additional wild
        horses reside outside of HMA boundaries in the area identified as the Stone Cabin

24           Complex gather area. These excess wild horses need to be removed in order to
        achieve the established AML, restore a thriving natural ecological balance (TNEB)

25           and prevent further degradation of rangeland resources.

26   AR-81:SC_6189.

**Page 22 - COMPLAINT**

64.     As to step two, Defendants made their requisite determination that action is necessary to remove the excess animals. This is/was demonstrated by the "Decision" in the 2023 DR, prescribing a wild horse management plan "to implement the Proposed Action (Alternative A)" as described in the 2023 FEA, adding that such "proposed action is consistent with the land use plans and would allow for achievement of management objectives in the Stone Cabin Complex," and further adding that the Defendants "**would gather and remove excess wild horses within and outside of the Stone Cabin Complex to achieve AML (approximately 689 as of March 2022) through an initial gather or follow-up gather(s) if needed, and administrated or booster population control measures to gathered and released horses through subsequent maintenance gathers over a period of ten years … [which] would allow BLM to achieve management goals and objectives of attaining a herd size that is at the low range of AML, reducing wild horse population growth rates, achieve a thriving natural ecological balance on the range as required under the WFRHBA, and to allow for recovery of degraded rangeland resources**." AR-79:SC_6175 (emphasis added).

65.     Notwithstanding, and contrary to the explicit language in the WFRHBA, Defendants conditioned the actual implementation of its management action upon "off-range corral space availability," AR-81:SC_6194, and upon "funding limitations and competing national priorities," *id*. (hereinafter referred to as "*Off-site Conditions*"). These *Off-site Conditions* were stated as part of the Proposed Action (Alternative A) in the 2023 FEA, *id*., which was selected and implemented by the 2023 DR, AR-79:SC_6175.

66.     Defendants flip-flop on both sides of the fence to excuse their deferral before the IBLA. On one side of the fence, Defendants stated that the Plaintiffs "offer no evidentiary support of their claim that the BLM relies on those off-site conditions to indefinitely defer the actual implementation of any portion of the [2023 DR]." BLM's Response dated September 22, 2023, at 7:11-13. On the other side of the fence, Defendants stated the 2023 FEA "explains that the population control activities … may be subject to … factors," *id*. at 7:13-14, such, as

"'Funding limitations and competing national priorities may impact the timing and ability to gather and conduct the population control components of the Proposed Action,'" *id.* at 7:14-16 (hereinafter referred to as "*Other Off-site Conditions*"). However, as alleged below, whether the reason for the deferral is the *Off-site Conditions* or the *Other Off-site Conditions*, neither are legally authorized to indefinitely defer the implementation of the wild horse management plan, including the gather and removal of the excess wild horses within and outside of the Stone Cabin Complex to achieve AML through an initial gather. *See* AR-79:SC_6175.

67.     None of these conditions are permitted under the WFRHBA or under the WFRHBA regulations. "[D]iscretion evaporates once BLM determines 'that action is necessary to remove excess animals,' 16 U.S.C. § 1333(b)(2)." *Western Rangeland Conservation Association v. Zinke*, 265 F.Supp.3d 1267, 1282 (D. Utah 2017).

68.     The WFRHBA, 16 U.S.C. §§ 1331-1340, and the WFRHBA regulations, 43 C.F.R. Part 4700 (10-1-2022 Edition), do not disclose that the *Off-site Conditions* or *Other Offsite Conditions* can defer the actual implementation of the Act or the regulations.

69.     The WFRHBA is explicit in Section 1333(b)(2) as to the directions to the Secretary to "***immediately remove*** excess animals from the range so as to achieve appropriate management levels" (emphasis added). None of these directions include authority to condition the immediate removal of excess animals. *See* 43 C.F.R. § 4720.1 (10-1-2022 Edition) ("Upon examination of current information and a determination by the authorized officer that an excess of wild horses or burros exists, **the authorized officer shall remove the excess animals immediately in the following order**. (a) Old, sick, or lame animals shall be destroyed …; (b) Additional excess animals for which an adoption demand by qualified individuals exists shall be humanely captured and made available for private maintenance …; and (c) Remaining excess animals for which no adoption demand by qualified individuals exists shall be destroyed …" (emphasis supplied)).

70.     Here, as alleged above, Defendants exercised their discretionary authority in their 2023 DR. This authority prescribed an action that "would allow BLM to achieve management

goals and objectives of attaining a herd size that will not exceed AML and that will result in a TNEB on the range as required under the WFRHBA," AR-81:SC_6194, yet the Defendants then unlawfully conditioned such action via the *Off-site Conditions* and/or the *Other Off-site Conditions*; violating 16 U.S.C. §§ 1333(b)(1), 1333(b)(2), and their implementing regulations, i.e. 43 C.F.R. § 4720.1.

71.     Defendants cited neither in their 2023 DR, 2023 FEA nor in their filings before the IBLA to any law to support the *Off-site Conditions* and/or the *Other Off-site Conditions*. In fact, a case out of the U.S. District Court, District of Utah, entitled *Western Rangeland Conservation Association v. Zinke*, 265 F.Supp.3d 1267 (D. Utah 2017), actually supports against such conditions.

72.     *Western Rangeland Conservation Association* involved a situation wherein a party challenged BLM's failure to immediately gather and remove excess wild horses upon the public lands. While the case ultimately turned on the "unreasonable delay" standard under the *Administrative Procedure Act*, 5 U.S.C. § 706(1), as opposed to an "arbitrary and capricious" standard under the *Administrative Procedure Act*, 5 U.S.C. § 706(2), as is the case here, the case grappled with the authority of BLM to condition the immediate gather and removal of excess wild horses under the WFRHBA. The court in *Western Rangeland Conservation Association* resolved the struggle by distinguishing BLM's authority based upon *on-site* gather conditions (to which the court found BLM to have "some discretionary space" under the WFRHBA) and BLM's authority based upon *off-site* gather conditions (to which the court found BLM to have very little discretionary space under the WFRHBA). In this regard, the court stated:

> Based on these practical realities, the court cannot interpret Section Three to require removal of excess wild animals without any intervening delay -- such an interpretation would contravene the ultimate purposes of the WHA by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving. … Section Three's mandate to "immediately remove" must therefore include some discretionary space in which BLM may plan and execute safe, efficient, and effective removals consistent with the broader purposes of the WHA and in compliance with other statutory duties.

**At the same time, the court cannot accept BLM's contention that the "pace and timing" of removals are entirely discretionary. … The term "immediately" must mean something -- its presence in the statute necessarily places some temporal limits on any discretion BLM has to plan and execute removal actions.** The D.C. Circuit has explained that the term "immediately" indicates that Congress desired that "excess horses ... be removed expeditiously" and decided that "prompt action was needed to redress ... imbalance" in wild horse populations on public lands. … Indeed, the statute indicates that "immediate [ ]" removal action is required "so as to restore a thriving natural ecological balance to the range[ ] and [to] protect the range from the deterioration associated with overpopulation." … **Any unnecessary delay or lack of urgency in reducing the population to within AML would contravene these purposes by allowing excess wild horses to persist, propagate, and consume an imbalance of already scarce resources. With the viability of the range and the wild horses themselves in immediate peril as a result of overpopulation, BLM cannot postpone action to remove excess wild horses once it determines that such action is necessary.** To the extent that practical realities preclude truly "immediate" removal, BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively. Proper planning and execution would of course account for many of the practical realities that BLM has identified, including due analysis of circumstances on the ground, compliance with NEPA and FLPMA, and retention of experienced contractors.

**In sum, once BLM determines that an overpopulation exists in a given area and action is necessary to remove that overpopulation, Section Three demands that BLM address the overpopulation through removal and that the agency begin and complete removal as soon as logistically possible**.

*Western Rangeland Conservation Association*, 265 F.Supp.3d at 1284-1285 (emphasis added, internal citations omitted, and internal footnotes omitted).

73.     There is a clear distinction between on-site gather conditions and off-site gather conditions. On the one hand, as to on-site gather conditions, Defendants maintain "some discretion space" under Section 3 of the WFRHBA to ensure that the actual gather and removal are planned and executed on-the-ground in a safe, efficient, and effective manner. *Western Rangeland Conservation Association*, 265 F.Supp.3d at 1284. On the other hand, as to off-site gather conditions, Defendants maintain little discretion given the temporal limits under Section 3 of the WFRHBA to actually remove the excess animals from the public lands itself. *See Western Rangeland Conservation Association*, 265 F.Supp.3d at 1285 (wherein the District Court stated that "[t]o the extent that practical realities preclude truly "immediate" removal, BLM may only

/ / /

**Page  26 - COMPLAINT**

1  delay necessary removal actions insofar as delay is necessary to plan and execute the actions

2  safely and effectively," i.e., the on-site gather mechanisms).

3      74.    In addition, the *Off-site Conditions*, i.e., "off-range corral space availability," AR-

4  81:SC_6194, and "funding limitations and competing national priorities," *id*., were actually

5  considered and addressed by the court in *Western Rangeland Conservation Association* as not

6  being within the Defendants' discretionary space, stating:

> … the defending parties suggest that BLM has wide discretion in how to
> implement Section Three's mandate and that the current … approach to wild
> horse management fulfills BLM's statutory obligation to "immediately remove"
> excess animals: "Because the [WHA] imposes no specific timetable for removing
> horses after [BLM] has made the required removal determinations, especially
> when taking into account all the complex and competing factors surrounding
> removal actions, there has been no 'delay' in this case …" … The court must
> reject BLM and Defendant-Intervenors' arguments on this point.

> BLM's … approach to removal fails to fulfill the agency's Section Three duty to
> "immediately remove" excess animals in at least two fundamental ways. First, the
> "phased-in" approach prioritizes gradual removal and other management
> techniques over prompt removal to within AML. As explained above, Section
> Three unequivocally requires BLM to address overpopulations through immediate
> removal of excess animals once the agency makes certain triggering
> determinations regarding an area of the public lands. Having made the requisite
> determinations in the areas at issue, BLM cannot choose to address the identified
> overpopulation through gradual removals and the application of
> immunocontraceptives and adjustment of sex ratios -- the agency *must* address the
> overpopulation through immediate removal.

> Second, the … approach contemplates gradual, rather than "immediate[ ]"
> removal of excess animals. Though Section Three imposes no specific timetable
> for necessary removals, the statute clearly demands prompt removal and forbids
> unnecessary delay. BLM urges that a six-to-ten-year delay is necessary "due to
> **limited resources** [and] **competing removal needs** across [ten] western states,"
> …, but such broad administrative concerns cannot erase Section Three's demand
> for urgency. While it is clear that Section Three's mandate to "immediately
> remove" excess wild horses must account for the practical realities of the removal
> process, the fundamental nature of BLM's statutory duty cannot be altered by the
> **agency's budgetary constraints**. Here, the six-to-ten-year timetable of the
> "phased-in" approach is primarily attributable to these broader administrative
> constraints and not to the practical realities of removal. Indeed, BLM
> acknowledges that the "phased-in" approach to removal is required because
> "[n]ationwide, **short and long term holding space** for excess wild horses
> removed from the range is limited." … Further, the total numbers of animals
> removed over the life of the plan is at least partially contingent on "administrative
> factors (**budget**, adoptions, **holding space**, etc.).." … Such "administrative
> factors" do not give BLM license to redefine their statutory obligation under

**Section Three. As explained above, BLM is required by law to remove excess animals to within AML as soon as the actions necessary to complete removal can be safely and effectively carried out**. Removal that occurs gradually over nearly a decade does not fulfill that requirement.

*Western Rangeland Conservation Association*, 265 F.Supp.3d at 1286-1287 (emphasis added, internal citations omitted, and internal footnotes omitted).

75.     It is not disputed that Defendants themselves "determined that excess wild horses are present on public lands within and outside the boundaries of the Stone Cabin Complex and that removal of these wild horses to within appropriate management level (AML) is necessary to achieve a thriving natural ecological balance." AR-79:SC_6174. This determination demanded -- subject only to the on-site gather conditions (which are included and *not disputed* in the 2023 FEA, Appendix V., "Gather Operations Standard Operating Procedures", AR-81:SC_6311-16) -- that Defendants address the overpopulation through the immediate implementation of their wild horse management plan, inclusive of the initial removal of the excess wild horses in the Complex to low AML, and not conditioned upon the *Off-site Conditions* and/or the *Other Off-site Conditions*.

76.     Even the *Western Rangeland* court explicitly noted that the "fundamental nature of BLM's statutory duty cannot be altered by the agency's budgetary constraints," and that "'administrative factors' do not give BLM license to redefine their statutory obligation under Section Three" of the WFRHBA. *Western Rangeland Conservation Association*, 265 F.Supp.3d at 1287.

77.     Plaintiffs have no other legal remedy for the Defendants to implement their own wild horse management plan, inclusive of the initial removal of the excess wild horses from the SCC other than the statutorily prescribed reliance on agency action. *See* 16 U.S.C. § 1334 ("In no event shall such wild free-roaming horses and burros be destroyed except by the agents of the Secretary").

/ / /

**Page  28 - COMPLAINT**

78.     Accordingly, Defendants violated their statutory and regulatory obligations under the WFRHBA and the regulations promulgated thereunder to defer (and continue to defer) the *actual* implementation of the 2023 DR, inclusive of any reliance upon the *Off-site Conditions* and upon the *Other Off-site Conditions*, subject only to <u>on-site</u> conditions as the court determines are reasonable and consistent with the WFRHBA and the regulations promulgated thereunder.

79.     Wherefore, for the reasons and violations of the WFRHBA alleged in paragraphs 1-78, the 2022 DR constitutes final agency action judicially reviewable by this Court pursuant to 5 U.S.C. § 704, and such agency action must be held unlawful and be set aside to the extent it is applied by the Defendants to defer (and continue to defer) the *actual* implementation of the 2022 DR, inclusive of the *Off-site Conditions* and *Other Off-site Conditions*, in accordance with *Administrative Procedure Act*, 5 U.S.C. § 706(2)(A), (C). Preliminary and/or permanent injunctive relief should be granted to compel the *actual* implementation of the 2023 DR subject only to the <u>on-site</u> conditions as the court determines are reasonable and consistent with the WFRHBA.

## PRAYER FOR RELIEF

Plaintiffs request that the Court grant the following relief:

A.  Order, declare, and adjudge that the *Off-site Conditions* and *Other Off-site Conditions* in the 2023 DR, 2023 FONSI, and 2023 FEA allowing the deferral (and continued deferral) of the *actual* implementation of the 2023 DR are unlawful and are in violation of WFRHBA and the regulations promulgated thereunder, other than the <u>on-site</u> conditions as the court determines are reasonable and consistent with the WFRHBA and the regulations promulgated thereunder;

B.  Issue an order setting aside and vacating the *Off-site Conditions* and *Other Off-site Conditions* in the 2023 DR, 2023 FONSI, and 2023 FEA, other than the <u>on-site</u> conditions as the court determines are reasonable and consistent with the WFRHBA and the regulations promulgated thereunder;

1      C.  Grant preliminary injunctive relief and permanent injunctive relief to compel the

2          *actual* implementation and continued implementation of the 2023 DR subject only to

3          <u>on-site</u> conditions as the court determines are reasonable and consistent with the

4          WFRHBA and the regulations promulgated thereunder; and

5      D.  For such other and further relief as the Court deems just, proper, and equitable,

6          including an award of the Plaintiffs' attorney fees and costs under any applicable law,

7          including the *Equal Access to Justice Act*, 28 U.S.C. § 2412.

8      DATED this 17th day of October, 2023.

9                   ***SCHROEDER LAW OFFICES, P.C.***

10

11              By: <u>*/s/ Therese A. Ure Stix*</u>
                    Laura A. Schroeder, NSB #3595

12                   Therese A. Ure Stix, NSB #10255
                    Caitlin R. Skulan, NSB #15327

13                   *Schroeder Law Offices, P.C.*
                    10615 Double R Boulevard, Suite 100

14                   Reno, Nevada 89521
                    Telephone Number:     775-786-8800

15                   Telecopy Number:      877-600-4971
                    Emails:     counsel@water-law.com

16                          Laura Schroeder - schroeder@water-law.com

17                        Therese A. Ure Stix - therese@water-law.com
                        Caitlin R. Skulan - c.skulan@water-law.com

18                   *Attorneys for Plaintiffs, Colvin & Son, LLC and Stone Cabin Ranch, LLC*

19

20

21

22

23

24

25

26

**Page  30 -** COMPLAINT